1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11   JOHN GOOLD,                             )   Case No.: 1:13-cv-00438 JLT
                                             )
12              Plaintiff,                   )   ORDER DENYING DEFENDANT'S MOTION
                                             )   FOR SUMMARY JUDGMENT
13        v.                                 )
                                             )   (Doc. 37, 43)
14   HILTON WORLDWIDE, et al.,               )
                                             )
15              Defendants.                  )
16   _____)

17        In this action, Plaintiff claims that he was fired in retaliation for complaining about sexual

18   harassment suffered by another employee and because he complained that the other employee's firing

19   was unlawful.  Defendants seek summary judgment, or in the alternative summary adjudication and

20   argue that they had legitimate business reasons for the firing.  For the following reasons, Defendant's

21   motion for summary judgment is **DENIED.**

22   **I.    Statement of Facts**

23        Plaintiff was hired by Hilton Worldwide in 1998.  (JUDF 1)  Plaintiff was transferred to the

24   Bakersfield Doubletree Hotel in June 2006.  (JUDF 2)  At the Bakersfield hotel, Plaintiff was the

25   Director of Finance.  (JUDF 4)

26        In December 2006—six months after Plaintiff's transfer to Bakersfield though only four

27   months after he began working full-time in Bakersfield (Doc. 39-2 at 14)—the results of an audit of

28   the finances of the Bakersfield hotel were determined to be unacceptable to Plaintiff's superiors.

(DUDF 23-25) Plaintiff was asked to take immediate corrective action. (DUDF 25) He was denied a merit raise in February 2007 but was told this would be reevaluated in the second quarter of 2007, "based upon progress on financial audits and with team . . ." (DUDF 23-27)   However, Plaintiff received a good performance review for 2006 and had been awarded a raise when he was transferred to Bakersfield in mid-2006. (Doc. 39-2 at 14)

Likewise, the performance review for 2007 yielded an "Overall Leadership Evaluation Rating" of a "3" which meant he was "SKILLED, Fully meets the standards, 75-88% competency, overall good work, some room for improvement. (Doc. 41-5 at 16)  Plaintiff asserts he received a similarly good evaluation 2008 also.  (Doc. 39-2 at 14)

In September 2009, it was discovered that a payroll clerk, Julio Cumpa, had failed to check his e-mail for five days and, as a result, he failed to have prepared for Bill Murray, the Bakersfield hotel's General Manager, a final paycheck for an employee who was being terminated.  (DUDF 28-29) Murray alerted Plaintiff of this failure and instructed him to discuss this issue with Cumpa. Id.

In October 2009, a subordinate of Plaintiff's, Dora Medrano, complained to him that she was being sexually harassed.  (DUDF 51) The alleged harasser was the hotel's Human Resource Director, Michael Howard.  (Doc. 41-1 at 12)  Medrano complained that the harassment entailed Howard making suggestive comments and touching Medrano inappropriately.  Id.   Plaintiff immediately reported the complaint to Bill Murray.  (DUDF 53)  As a result of the harassment, Plaintiff invited Medrano to take her rest breaks with him in order to prevent further harassment by Howard.  (Doc. 41-1 at 12; DUDF 55)  In January 2010, Plaintiff mentioned the complaint to the Regional Director of Finance, Wes Thornell (Plaintiff's corporate supervisor), during a routing visit by Thornell to the property.  (DUDF 54)  There is no evidence the harassment complaint was investigated or that any corrective action was taken by Hilton to address Howard's conduct.

Once again, the 2009 review again yielded a "3" rating.  (Doc. 41-5 at 41)  Moreover, Plaintiff was only one of two employees who received a merit raise that year. (Doc. 39-2 at 14)

On January 7, 2010, Plaintiff was asked to sign an acknowledgement detailing Hilton's rest and meal break policy.  (DUDF 13) The policy sets forth the number of rest breaks allowed and when they should be taken.  Id.  The policy also advises that "YOU ARE RESPONSIBLE TO TAKE

2

YOUR BREAKS AS INDICATED ABOVE. ** team members who repeatedly fail to properly record his or her breaks and meal periods will be subject to disciplinary action up to and including termination." Id. (Doc. 41-3 at 14)

In February 2010, the company's 800-hotline number received an anonymous complaint that Medrano was taking longer than 10 minutes for her breaks.  (DUDF 56) An investigation was undertaken by Howard (Doc. 41-7 at 39; DUDF 57) who concluded that Medrano was frequently taking longer than 10-minute rest breaks.  (DUDF 57)  As a result, Medrano was suspended for two days.  (DUDF 59) In response to the written statement clarifying to her why she was being disciplined, she explained the longer breaks were taken, "With permission of my supervisor (Dir of Finance) John Goold.  Wasn't done intentionally.  Will from now on follow and take care of my breaks as needed." (Doc. 37-6 at 90; DUDF 61-62)

Plaintiff was unaware of any complaint made about Medrano and was surprised by the investigation.  (Doc. 41-1 at 12)  He confronted John Sommer, the Regional Director of Human Resources, and questioned why the matter could not be resolved with a counseling session rather than suspension.  Id.  He questioned also whether Medrano's discipline was related to her sexual harassment complaint, given Howard—the claimed harasser—conducted the investigation.  Id. Sommer told Plaintiff that Plaintiff should have reported the harassment complaint earlier and seemed to be unaware that Plaintiff *had* forwarded Medrano's complaint to Murray. Id.

On February 26, 2010, Bill Murray documented that Plaintiff's department failed to properly administer the meal and break policy.  (DUDF 30-35)  Murray noted that Plaintiff failed to ensure meal breaks waivers were properly maintained and failed to provide adequate supervision of the employee responsible for this action, Julio Cumpa.  Id.  Murray noted that Sommer had documented that this issue was ongoing since 2008 and that Plaintiff's failure to "ensure compliance may result in further disciplinary action, up to and including separation from employment."  Id.  Plaintiff signed the Murray document acknowledging its contents.  Id.

In March 2010, Murray prepared a memo which identified Plaintiff's performance failures. (DUDF 63-64)  Specifically, the memo addressed the meal and rest break policy and documented that accounting staff members were required to comply with them and that Plaintiff was obligated to

review and approve the time sheets of his staff.  Id.  However, there is a dispute as to whether Plaintiff was ever provided a copy of this memo and whether its contents were ever discussed with him.  The document is not signed by Plaintiff and there is no indication on the document that he refused to sign it.  (Doc. 37-6 at 92; 39-2 at 13)

In June 2011, Wes Thornell, documented a number of shortcomings in Plaintiff's performance. (DUDF 36-41)  The memo ended by stating, "This level of job performance cannot occur in the future. We have talked previously on these issues in greater detail and I am confident that you already understand the accounting issues that had to be dealt with and your performance that contributed to this.  Going forward, similar job performance that falls to this level below expectation will result in further disciplinary action up to and including termination."  Id.  Plaintiff signed the document indicating, "I have read, agree and understand with [sic] the comments made here."  (Doc. 37-6 at 15) Nevertheless, for the 2011 work year, Plaintiff received a good performance review. (Doc. 39-2 at 14)

In February 2012, another anonymous complaint was received by the 800-hotline number again complaining that Medrano was taking longer than 10 minutes for her rest break.  (DUDF 56) The complaint noted that Plaintiff, Bill Murray and the current HR Director, Javier Pimental, were aware of her actions. (Doc. 37-6 at 61-62; DUDF 66)

John Sommer instructed Javier Pimental via e-mail to conduct an investigation into the complaint.  (DUDF 67) Pimental studied the videotapes maintained by the hotel which reflected employees taking their breaks.  (DUDF 68-69)  The videos showed Medrano and Plaintiff leaving for the "smokers' area," which was near the loading dock, and returning later.  Id.  For several, week-long periods, the videotapes showed Medrano leaving and returning in intervals that exceeded 10 minutes. Id.  Nevertheless, the time sheet completed by her and her coworkers and signed by Goold, reflected only 10 minutes taken for rest breaks.  (DUDF 70)

On March 21, 2012, Plaintiff's department underwent an audit.  (Doc. 41-6 at 2)  His Department received a "Total Score" of "92.00%" out of a total of 100%.  Id

On April 19, 2012, Medrano was fired because she took breaks that were longer than that permitted by hotel policy and because Medrano had been disciplined for the same infraction two years before. (DUDF 71-72)  During Pimental's investigation, he discovered also that Plaintiff's

4

1  subordinates were consistently late to work and that Plaintiff failed to take action to address this

2  tardiness.  (DUDF 90)

3      Becoming concerned that Medrano's firing could implicate the security of his own job, on

4  April 20, 2012, Goold inquired of Murray whether his job was at risk.  Murray denied that it was.

5  (Doc. 41-1 at 14)  Later, on April 26, 2012, Goold expressed to Murray that he felt that Medrano's

6  firing was unfair and should be reversed.  Id. at 15.  He reminded Murray that the rest breaks were

7  frequently interrupted by work issues which was why it appeared that the rest breaks were longer than

8  10 minutes but denied that the non-work portion of the rest periods were longer than 10 minutes.[1]  Id.

9  In addition, Plaintiff expressed that Medrano had contacted him and expressed her belief that her firing

10 was related to her sexual harassment complaint made in 2009.  (Doc. 41-1 at 15; DUDF 84)  Plaintiff

11 stated that Medrano "might have a claim" and he would "back up her story" in the event she decided

12 to sue.  Id.  Plaintiff suggested that it would be in the hotel's interests to rehire Medrano to stave off

13 litigation.  (Doc. 41-1 at 15)

14     The day before, on April 25, 2012, Plaintiff expressed to Pimental that Medrano's firing was

15 wrong, that she was a good worker and that he wanted her to be re-hired.  (Doc. 41-1 at 14; DUDF 84)

16 Plaintiff explained that they used the "smoking area as a meeting place as well" in explanation for why

17 it appeared that Medrano's breaks were too long.  (Doc. 41-1 at 14)  Plaintiff told Pimental that based

18 upon the firing, he believed Medrano "had a very legitimate reason to sue us and I would not lie for

19 the Company and [would] back up her claim."  (Id.; DUDF 84)  He did not express to Pimental any

20 concerns that the firing related to her earlier sexual harassment complaint.[2]  Id.

21     On May 2, 2012, Plaintiff reported to work after having been out sick for two days.  (Doc. 41-1

22 at 15)  When he did so, he was asked to meet with Murray, Sommer and Pimental.  Id.  At this

23 meeting, Plaintiff was fired.  Id. He was not told the reason for his firing at that meeting because, it

24 appears, he would not allow the others to express the reasons.  Id.  When it was attempted the first

25 time, Plaintiff interrupted and stated, "This is bullshit and you know it" and when it was attempted a

26 _____

27 [1] It is undisputed that the video camera captured images only of Medrano and Plaintiff going to and coming from their rest periods and it was not situated such to capture images of what occurred during these breaks.

28 [2] Pimental did not work at the Bakersfield hotel when the 2009 sexual harassment complaint was made by Medrano or reported by Plaintiff.  (Doc. 37-6 at 104)

second time, he walked out of the meeting.  Id.  Later, when Plaintiff applied for unemployment benefits, he learned that the hotel claimed that he was fired for poor performance, failure to manage his subordinates and for falsifying the rest period records to show that Medrano took only 10-minute rest breaks.  (Doc. 37-6 at 67; DUDF 86)

## II.    Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  The moving party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that a factual dispute exits.  *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court examines the evidence provided by the parties, including pleadings depositions, answer to interrogatories, and admissions on file.  *See* Fed. R. Civ. P. 56(c).

## III.   Evidentiary Objections

Defendants make numerous objections to Plaintiff's evidence.  For the most part, Defendants provide lengthy excerpts from various declarations and then lodge one or more objections.  They do not explain the basis for their objections and fails to set forth which part of the entire excerpt is implicated by the objection(s).  Thus, all objections made in this manner[3] are **OVERRULED.**

### A.   <u>Medrano Declaration</u>

Because the Court does not rely upon the Medrano declaration, the Court declines to rule on Plaintiff's evidentiary objections in this regard except as noted above.

### B.   <u>Kuhn's Declaration</u>

1.   Relevance – See note above.

a.   Kuhn Decl., Paragraph 1 at 1:17-18: **OVERRULED**.  This information is relevant to establish foundation for the speaker's personal knowledge.

b.   Kuhn Decl., Paragraph 3 at 2:1-6: **OVERRULED**.  Information contained in the excerpt is relevant and demonstrates he formed a certain understanding of the policies

---

[3] This includes objections 1, 2 and 4-6 to the Medrano declaration, objections 2-4 to the Kuhn declaration, objections 1- 3 to the Rumph declaration, objections 1 and 3-23 to the Goold declaration and objection 1 to the deposition testimony of Javier Pimental.

1   that was similar to Plaintiff's understanding.  Thus, the evidence is relevant to the topic of pretext.

2              2.       Various objections

3              a.       Kuhn Decl., Paragraph 2 at 1:19-27: **OVERRULED**.  This information

4   is relevant to establish foundation outlining the speaker's understanding of the policies at issue.  The

5   Court does not accept the statements made to Kuhn as true, only that he formed a certain

6   understanding of the policies that was similar to Plaintiff's understanding. Thus, the evidence is

7   relevant to the topic of pretext and do not constitute hearsay.

8          The Court declines to rule on the other objections related to the declaration of Mr. Kuhn,

9   except as noted above, because the Court does not rely upon this evidence in this order.

10      **C.**    **Rumph's Declaration**

11             1.       Various objections

12             a.       Rumph Decl., Paragraph 3 at 1:25-2:4: **OVERRULED**. The Court

13   accepts this statement for the limited purpose of authenticating the transcript, an excerpt of which was

14   properly attached to the motion. L.R. 133(j).

15         The Court declines to rule on the other objections related to the declaration of Mr. Rumph

16   except as noted above, because the Court does not rely upon this evidence in this order.

17      **D.**    **Goold's Declaration**

18             1.       Relevance

19             a.       Goold Decl., Paragraph 7 at 3:19-27: **OVERRULED**. Whether Plaintiff

20   received the document and whether its contents were discussed with him is keenly relevant.

21             2.       Various objections

22             a.       Goold Decl., Paragraph 8 at 3:28-4:15:  **OVERRULED**.  The

23   information that Plaintiff always received good performance evaluations and received a merit raise

24   when others didn't is relevant to the topic of pretext.  The other objections are not well-taken or

25   Defendants fail to explain why they believe they apply.

26             b.       Goold Decl., Paragraph 8 at 4:15-22: **OVERRULED**.  The information

27   that Plaintiff did not receive a merit raise in 2007 because he had received one a few months before is

28   pertinent to the topic of pretext.  The Court does not consider the rest of the information in the excerpt

the statements attributed to others.  The other objections are not well-taken or Defendants fail to explain why they believe they apply.

The Court declines to rule on the other objections related to the declaration of Mr. Goold, except as noted above, because the Court does not rely upon this evidence in this order.

### E.      Deposition testimony of Javier Pimental

Plaintiff provides an extended excerpt of testimony given by Javier Pimental at his deposition. In this order, the Court relies only upon a limited portion of this testimony. Thus, the Court considers the objections only to this limited portion.

1.      Various objections

a.      Testimony as set forth at Doc. 41-7 at 54:8-23: **OVERRULED**.  The witness, as the Human Resources director for the hotel has adequate expertise and foundation to explain what the hotel's policies required when providing an employee a disciplinary memo.  If Pimental did not know what the disciplinary policies were in 2010, he could have said so.  To the contrary, he expressed his understanding of policies in place at that time.  Notably, Pimental does not disavow this testimony in his declaration or attempt to clarify it.   Moreover, whether this memo was provided to Plaintiff is pertinent to the issue of pretext.

The Court declines to rule on the other objections related to the testimony of Mr. Pimental, except as noted above, because the Court does not rely upon this evidence in this order.

### F.      General objection

Defendants assert that all of Plaintiff's evidence should be discarded because he failed to respond to duplicate their statement of undisputed facts and respond specifically to each fact. However, though Plaintiff did not duplicate the entirety of the statement, he admitted that all of the facts were undisputed except for a few.  As to these, Plaintiff *did* duplicate the statement and address why he disputed each fact.  The Court does not find that this requires disregarding Plaintiff's evidence and, to the contrary, it greatly eased the Court's review and any other determination would, in a draconian fashion, place form over substance.

Defendants argue also that because Plaintiff disputed very few of their undisputed facts and failed to cite to evidence to support the dispute, he is precluded from offering any evidence.  First, of

course, a couple of the facts were disputed because Plaintiff asserted that Defendants failed to properly characterize the evidence they cited in support of the fact; this is proper.  Second, as to other facts, Plaintiff *did* cite to evidence to support his claim of dispute.  Finally, Defendants fails to cite to any authority that *only* evidence which is tied to an undisputed fact may be used to oppose a motion for summary judgment.  The Court Local Rule 260(b) does not state this and neither does Fed. R. Civ. P. 56(c).  Thus, the objection made on the basis is **OVERRULED**.

## IV.     Discussion and Analysis

### A.       Plaintiff's Title FEHA Claims

Plaintiff alleges Defendants are liable for violations of FEHA.  (Doc. 1 at 5-6)  In particular, Plaintiff claims he was fired because he complained about sexual harassment suffered by a coworker and subsequent retaliation against her and because he made statements that her firing was unlawful and he would support her in a lawsuit against the Defendants.  (Doc. 1 at 5-6)  Notably, California Government Code § 12940(h) makes it unlawful,

> For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

Like claims brought under Title VII, claims for violations of FEHA involve shifting burdens as set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  <u>Guz v. Bechtal Nat'l Inc.</u>, 24 Cal.4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.").  First, the plaintiff bears the burden to establish a prima facie case of employment discrimination.  <u>Id</u>. at 354.  "While the plaintiff's prima facie burden is 'not onerous' [Citation], he must at least show 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . .'" <u>Id</u>. at 355.

To establish a prima facie case for retaliation, a plaintiff must demonstrate "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."

Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).  To do this, a plaintiff may rely upon a comparison with other similarly situated people or by demonstrating the other circumstances of the case that provide an inference that retaliation was the motive.  Hawn v. Executive Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir. 2010).

If a plaintiff succeeds, the burden of production shifts to the defendant to present admissible evidence demonstrating a legitimate nonretaliatory reason for its actions.  Guz, 24 Cal.4th at 355–56. If the defendant is successful, the presumption of discrimination falls away, and the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons are pretexts for discrimination.  Id. at 356.  The plaintiff can establish pretext by "directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Aragon v. Republic Silver State Disposal Co., 292 F.3d 654, 658–59 (9th Cir.2002).   A pretext may be shown through "very little" direct.  Little v. Windermere Relocation, Inc., 301 F.3d 958, 971 (9th Cir.2002).  On the other hand, where a plaintiff relies upon circumstantial evidence to demonstrate pretext, the evidence must be "specific" and "substantial" to create a triable issue.  Godwin v. Hunt Wesson Inc., 150 F.3d 1217, 1222 (9th Cir.1998);

### 1.    Plaintiff's prima facie case

#### a.    Protected activity

An employee, who opposes in good faith his employer's discrimination, has engaged in a protected activity even if it turns out, ultimately, that the employer's perceived discriminatory conduct was not unlawful.  Yanowitz, 36 Cal.4th at 1043.

Here, the evidence demonstrates that Plaintiff complained about sexual harassment of Medrano in October 2009.  He also complained that Medrano's suspension in February 2010 and her firing in March 2012 appeared to be related to her complaint of sexual harassment.  He reported that these acts were unlawful and that he intended to assist her in litigation against Defendant if she chose to file a lawsuit.   Defendants do not suggest that Plaintiff lacked a good faith belief that Defendants engaged in discrimination or retaliation when he made these statements.  Likewise, they do not dispute that they were aware of the statements.  Thus, each is protected by FEHA.  Yanowitz, 36 Cal.4th at 1043 ///

### b.      Adverse employment action

Although an adverse employment action must "materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim" (Yanowitz, at 1051-1052) "[A] wide array of disadvantageous changes in the workplace constitute adverse employment actions." Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000).

The parties do not specify the adverse employment actions they believe are at issue. Thus, the Court concludes Plaintiff claims the only adverse action was his termination in 2012. Defendant does not dispute that Plaintiff was fired. Thus, clearly, Plaintiff has clearly suffered an adverse employment action. *See* Guz, at 355 (termination is an adverse employment action).

### c.      Causal link

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff, 809 F.2d 1371, 1375 (9th Cir. 1987). "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Id., at 1376.

The statements made in 2009 and 2010, present a more difficult-to-establish causal connection to the adverse employment action. The amount of time that passed between these statements and the adverse employment action may undermine such a claim. On the other hand, the statements made in 2012 to Pimental and Murray, do not suffer from this same infirmity.

The 2012 statements complained about what Plaintiff perceived to be unlawful treatment of Medrano. Within days of these complaints, Plaintiff was fired. Given the short period of time between the statements and the firing, a causal link may be inferred between Plaintiff's protected activity and the adverse employment action. *See, e.g.,* Yartzoff v. Thomas, 809 F.2d at 1376 (inferring causation where adverse employment actions took place less than three months after the plaintiff's

complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); Strother v. S. Cal. Permanente Med. Grp., 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint).

### 2.      Legitimate, non-retaliatory business reasons

Defendants set forth information that Plaintiff has experienced performance issues in the years leading up to his firing.  (DUDF 81) They also present evidence that Plaintiff allowed Medrano to take rest breaks that far exceeded the 10 minutes permitted by hotel policy.  Id.  The evidence shows also that Plaintiff allowed Medrano and his other staff members to be tardy for work repeatedly with no apparent corrective action taken by him.  Id. Finally, despite these failures to comply with hotel policy, Plaintiff signed the time sheets indicating that his subordinates took their normal rest breaks.  Id. Moreover, Plaintiff did not dispute that Defendants' undisputed Fact number 81 which set forth legitimate, non-retaliatory business reasons for Plaintiff's firing. Accordingly, Defendants have met their burden of production.

### 3.      Pretext

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, (1981); see also Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094-95 (9th Cir. 2005).  Direct evidence typically consists of retaliatory statements or actions by the employer.  Coghlan, 413 F.3d at 1095.  Indirect evidence "requires an additional inferential step" to establish retaliation.  Id.

Here, there is no direct evidence that Defendants acted for purposes of retaliation.  However, Plaintiff presents indirect evidence demonstrating that Defendants retaliated against him when they fired him.

#### a.      Disparate treatment

Plaintiff has offered evidence that he was not the only one who signed time sheets onto which employees  detailed their work hours and rest and meal breaks, despite lacking knowledge whether the employees' entries were accurate.  Plaintiff implies that signing the time sheet was merely to ensure

breaks were provided rather than as verification the employee had taken no more time than hotel policy allowed.

Review of the time sheets at issue support Plaintiff's arguments.  First, there is an indication on the form requiring employees to acknowledge that they were expected to provide accurate entries. (Doc. 37-6 at 20, 21)  The time sheets read, "My signature below attests that I have received all rest periods to which I am entitled to on these work days and accurately report the time I have worked." Id. This was consistent with the 2010 policy which placed the onus of correctly reporting break times on the employees.  (DUDF 17)  The policy read, "team members who repeatedly fail to properly record his or her breaks and meal periods will be subject to disciplinary action up to and including termination." Id.

On the time sheet form—which is constructed of a table with various headings for employees to enter their times in and out—there is a column with the heading, "Signature," under which all of the employees have signed.  (Doc. 37-6 at 20, 21)  Below the time sheet table is the word, "Manager," and a line next to it.  Id.  Contrary to the language imposed on the employees that they are attesting to the accuracy of their times, there is no attesting language for the manager to acknowledge with his signature.  Id. Indeed, it does not even require that a signature be affixed and, presumably, simply noting the manager's name would be sufficient.  Id.

Despite this, Sommer *concludes* that Plaintiff's signature on these time sheets "confirm[ed] their accuracy" without any factual support for why he believes this is the case.  (Doc. 37-6 at 96) Likewise, Thornell states his *conclusion* that Plaintiff "approved" the time sheets.  Id. at 101.  Neither Sommer nor Thornell[4] provides factual support for their conclusions.  Id. at 96, 101.  Neither attests that they have personal experience using these time sheets or that Plaintiff or other managers were trained that their signatures constituted a declaration of accuracy.  Id.  Notably, neither Pimental nor Murray—the two local managers—make this claim.  Id. at 84, 105.  Murray testified that he did "not know" whether Plaintiff's signature on the time sheet meant he was verifying the employees did not

---

[4] Perhaps it is due to unartful drafting but it appears that Thornell is asserting that Plaintiff had been previously counseled to guard against employees taking longer than 10-minute rest breaks but recording the break as lasting only for 10 minutes. If this is the intent of the statement, it is incorrect.  (Doc. 37-6 at 101)

take longer breaks than the policy allowed.  (Doc. 41-8 at 7-8)

Pimental testified that he did not think that Plaintiff had falsified documents at the time he conducted his investigation[5] despite that he confirmed that the times listed by Medrano on the time sheet did not correspond to those reflected on the video.  (Doc. 41-7 at 49)  Pimental testified he knew of no other manager who had been disciplined when his/her subordinate took longer than 10 minutes for breaks despite that this abuse was widespread and occurred in all departments "across the board." Id. at 19.  Pimental was aware that business was conducted on breaks and admitted that he had interrupted others on break for work reasons.  (Doc. 41-7 at 21)

Likewise, Murray testified he was not required to verify the amount of time his secretary took breaks and that he did not know whether another local manager, Eric Kuhn, who was in charge of food service, was required to verify the accuracy of the amount of time each of his subordinates took for rest break. (Doc. 41-8 at 7-8)  Kuhn asserts that signing the time sheets was not a verification of the accuracy of the times reported by his employees and that he was trained specifically that his only obligation was to ensure that the each employee documented that he/she took the breaks.  (Doc. 39-2 at 5-6)  Thus, it appears that enforcement of the "verification" policy as it relates to time sheets was selective.

### b.    *Unsigned disciplinary memo*

Plaintiff argues that Defendant created evidence after the firing as evidence of pretext. Plaintiff refers to a March 5, 2010 memo in which, purportedly Murray detailed to Plaintiff performance issues and, more to the point, detailed the meal and rest period policies.  (Doc. 37-6 at 92)  Though there is a line for Plaintiff's signature, the document is not signed by him.  Id.  Murray testified that he presented the document to Plaintiff but Plaintiff refused to sign it.  However, Murray did not note this refusal on the document and HR Director, Javier Pimental, testified that hotel policy is to make such a notation when an employee refuses to sign a document.  (Doc. 41-7 at 54)  Plaintiff

---

[5] The Court notes that Pimental changed his deposition testimony in writing on April 30, 2014—after the motion was filed and more than two months after his deposition was completed—to say that, indeed, he *did* think Plaintiff had falsified the documents.  This change is improper.  Fed. R. Civ. P. 30(e) allows substantive changes to testimony *but only if* it is accompanied by "the reasons for making them."  Moreover, though *corrections* to deposition testimony are permitted, changes which *contradict* sworn testimony are not.  Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc., 397 F.3d 1217, 1225 (9th Cir. 2005).  Thus, the Court rejects this change and declines to consider it.

denies ever receiving the document while employed or ever having had the contents discussed with him.  (Doc. 39-2 at 13)  In addition, Plaintiff claims that he requested a copy of his personnel file in preparation for his EDD application hearing.  Id. When it was produced, this March 5, 2010 memo was not in his file.  Id.

Oddly, Murray fails to provide any detail about how the memo or its contents were conveyed to Plaintiff though Sommer indicates that Plaintiff was "counseled" at the time it was prepared.  (Doc. 37-6 at 95-96)  Sommer fails to explain whether he was present at the counseling session or how he learned of it and neither Murray nor Sommer explains why there was no note on the document indicating Plaintiff refused to sign it.

Thus, clearly, there is a question of fact as to when the document was prepared, whether it was presented to Plaintiff and whether Plaintiff was counseled about the requirements of rest breaks at that time.  When the evidence is taken most favorably to Plaintiff, it appears he raises a sufficient inference that the document was prepared at some time near to Plaintiff's termination rather than when he was fired.

### c.    Delayed termination

Plaintiff argues it is significant that all investigation conducted into his termination had been completed before he made his April 25 and 26, 2012 comments to Pimental and Murray.  Pimental supports this and makes clear that he completed his investigation of the events which lead to the firing of Medrano and Plaintiff the day before Medrano was fired.  (Doc. 41-7 at 40)  There is no evidence that any further investigation occurred. [6]  Moreover, at the time Medrano was fired on April 19, 2012 (DUDF 72-73), Defendants, admittedly, were considering terminating Plaintiff.  In fact, Sommer attests that he intended to terminate Plaintiff *before* Medrano was fired[7] though he did not speak to Thornell about this until sometime after Medrano was fired.  (Doc. 37-6 at 96-97) Despite this and without any further investigation, Plaintiff was permitted to work through May 2, 2012.  (DUDF 82) If

---

[6]  Interestingly, Murray testified that he was told by Hutton that Plaintiff would be fired based upon Pimental's investigation.  (Doc. 41-8 at 21) Even if Hutton also relied on the March 2010 memo as, apparently, Sommer did (Doc. 41-7 at 42-43), Murray, as the author of that memo was clearly aware of its contents at the time he told Plaintiff he knew of no "big issues" related to Plaintiff's job security.
[7]  If found to be true, this would undercut the claim that Plaintiff's 2012 protected activity gave rise to his firing.

16

1   Defendants believed that Plaintiff's breach of his management obligations was so severe, it is puzzling

2   why they fail to explain this delay.[8]

3          To the contrary, if the evidence is accepted, as it must, in the light most favorable to Plaintiff, it

4   appears that there were no plans to fire Goold at the time Medrano was fired.  A piece of evidence

5   which supports this is that, despite Murray's full knowledge of the outcome of Pimental's

6   investigation, Murray assured Plaintiff, at least indirectly, that his job was not at risk.  (Doc. 42-3 at

7   41) Murray did not admit this at his deposition but the e-mail exchange between Murray and Goold on

8   April 20, 2012, supports Plaintiff's claim.  Id.

9          In his e-mail to Murray, Plaintiff expressed concern that Murray had sought additional

10  assistance for Plaintiff's department and went behind his back to do so.  (Doc. 42-3 at 41)  Plaintiff

11  expressed to Murray that it was Plaintiff's obligation to seek additional help when it was needed and

12  felt that Murray seeking this assistance indicated "something 'bigger' is in the works regarding my job

13  performance which I am unaware of." Id.  Murray assured Plaintiff, "My intent was . . . to assist and

14  support you with the office coverage . . . **I know of no 'bigger' issue in the works, so please don't**

15  **be upset**." Id., emphasis added.  Again, taken in a manner favorable to Plaintiff, the Court agrees that

16  an inference has been raised that it was Plaintiff's protected activity, which occurred after this

17  exchange that gave rise to the firing rather than the reasons Defendants offer.

18         On the other hand, Plaintiff questions that if he had performance issues that merited

19  termination either at the time Medrano was fired or before, why he was permitted to continue to

20  work.[9]  It appears that after the last criticism was lodged against Plaintiff on June 17, 2011 (Doc. 37-6

21

22         [8] Defendants rely upon a blurb included in a statement attached to Plaintiff's opposition purportedly written by John
    Sommer.  (Doc. 41-2 at 27) The document is not sworn and, notably, Sommer fails to authenticate it in his sworn

23  declaration. (Doc. 37-6 at 95-96) In any event, the details of the blurb are inconsistent with the rest of the record.
         For example, the blurb claims that Plaintiff's termination was delayed due to Pimental's vacation which was taken

24  during the investigation. (Doc. 41-2 at 27)  However, Pimental's investigation was completed *before* Medrano was fired
    and can have no impact on the timing of Plaintiff's termination. (Doc. 41-7 at 32-39, 42)  In fact, Sommer's declaration

25  makes clear that the review of the time log sheets and "other supporting documentation" and the video footage all occurred
    *before* Medrano was fired. (Doc. 37-6 at 96-97)  Though the Court does not doubt that the management members needed

26  to consult on the topic, Sommer claims in his declaration that he decided Plaintiff should be fired *before* Medrano was fired
    (Id.) and Thornell claims Sommer expressed this *before* Medrano was fired. Id. at 101.  Clearly, either the evidence is in

27  conflict or Sommer merely formed his opinion that Plaintiff should be fired earlier than the others.  In any event, the Court
    does not accept this unsworn statement as evidence to explain the delay in the firing of Plaintiff.

28         [9] Without explanation, Defendants mischaracterize the February 26, 2010 memo provided to Plaintiff.  (Doc. 37-1 at
    21)  Defendants argue, "Murray stressed the gravity of wage and hour compliance and warned Plaintiff **that any future**

at 15-16), no unfavorable performance events occurred which would have indicated firing was being considered.  Indeed, he received a favorable 2011 evaluation—which appears to have been completed around the start of 2012— (Doc. 39-2 at 14) and a favorable audit of his department in March 2012. (Doc. 41-6 at 2)

### d.    Termination decision maker

Plaintiff makes much of the fact that it is unclear exactly who made the decision to terminate him.  At a hearing held in state court, Murray testified that he made the determination.  In response to the question, "And you made that decision to terminate Mr. Goold's employment?" (Doc. 41-2 at 6), Murray responded, "Yes, ma'am."  Id.

Then, in initial discovery responses, Defendants claim that Murray, Pimental, Sommer and Thornell made that determination.  Contrary to this, Pimental testified that he was not a decision maker.  (Doc. 41-7 at 41-42)  Likewise, Murray asserts in his declaration that he "endorsed" the decision to fire Plaintiff (Doc. 37-6 at 83) but testified that he was "directed" to fire Plaintiff by the Area Vice President, Brad Hutton.  (Doc. 41-8 at 13)  Despite this, though Defendants' have added that they admit that Brad Hutton was a decision maker (Doc. 42-3 at 22), they have not retreated from the position that Murray and Pimental had this role too.  Id.

On the other hand, Murray knew that Plaintiff and Medrano frequently conducted business meeting while "on break" but did not report this information to Sommer, Thornell or Hutton.  (Doc. 41-9 at 9-11) Pimental, himself, conducted business while on breaks with others who were on break. (Doc. 47-7 at 21) Likewise, neither Murray[10] nor Pimental, seemingly, had any understanding as to what a manager was supposed to do when a subordinate's break time was interrupted by work.[11] (Doc.

---

**failure to manage staff members** 'may result in further disciplinary action, up to and including separation of employment.'" Id., emphasis added.  However, the memo itself relates to the failure of Plaintiff's subordinate to ensure that employees submitted meal waiver forms. (Doc. 37-6 at 18)  The memo reads, "It is your responsibility as the Director of Finance to ensure that Mr. Cumpa is monitoring the daily payroll and ensuring full compliance with this and all other payroll related provisions of California Wage and Hour law. **Your failure in the future to ensure compliance** may result in further disciplinary action, up to and including separation of employment." Id., emphasis added.

[10] Murray testified that interrupted breaks were not to be retaken as of 2010 because, "Break periods are paid, and as such paid periods would not be retaken . . ." (Doc. 41-8 at 22)  See fn. 8.

[11] The position that Defendants were not obligated to relieve an employee of all work during a rest period appears to have violated California law.  In 2010 through 2013, California Labor Code § 226.7(a) provided in pertinent part, "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission."  Subsection (b) of this same statute read, "If an employer fails to provide an employee a

18

41-7 at 10-11) Pimental admitted that there was not a formal or informal policy or instruction given on this topic at management meeting. (Doc. 41-7 at 10-12)  Despite this uncertainty at the local hotel, neither Murray nor Pimental expressed to Sommer, Thornell or Hutton that Plaintiff's actions could be as a result of a training lapse.  (Doc. 41-8 at 21)  Likewise, though Pimental was aware that abuse of the 10-minute break period was rampant in the hotel, there is no evidence that he apprised his superiors of this fact during the investigation related to Goold and Medrano. (41-7 at 19)

Thus, though there is uncertainty as to those who actually decided to fire Plaintiff, only Murray and Pimental had the full information about the circumstances and but did not provide it to the others. Even still, the testimony of Murray and the Defendants' responses to discovery demonstrate that both Murray and Pimental decided to fire Plaintiff and, given they are the two to whom Plaintiff expressed his concerns over the legality of Medrano's firing, the Court must conclude that Plaintiff has met his burden of demonstrating a triable issue of fact that the firing was a pretext for retaliation.

### e.   Conclusion

For these reasons, the Court finds there are triable issues of fact whether Defendants' proffered reasons for Plaintiff's firing were a pretext for unlawful retaliation.

### B.   Defamation

Libel is "a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.  Cal. Civ. Code § 45.  Likewise, slander is "a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶¶]  3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other

---

meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."  In 2012, Wage Order No. 5 read, "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period."  Employees could waive a rest period, however, though there is no evidence here that Medrano did that. Brinker Rest. Corp. v. Superior Court, 53 Cal.4th 1004, 1033 (2012).

Notably, the February 26, 2010 memo from Murray to Plaintiff contains further support for what appears to be a violation of Labor Code § 226.7.  The memo reads, "On duty meal waivers are also required for any team member *not able to be relieved of all duties for a meal period*." Emphasis added.  Thus, it appears that rather than relieve the employee of duties or pay the employee the extra hour of pay, Defendants required employees to submit a waiver of the meal break.

occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, . . . [¶] or 5. Which, by natural consequence, causes actual damage." Cal. Civ. Code 46.  A communication may be privileged is it is made,

> In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

Cal. Civ. Code § 47.  The statements made orally and in writing related to Plaintiff's falsification of time records falls within the protection of Civil Code § 47.  This privilege will be lost, however, if the statements are made with actual malice.  Sanborn v. Chronicle Pub. Co., 18 Cal. 3d 406, 413 (1976).  Actual malice may be shown where the speaker acts purposefully to cause injury or where the speaker lacked reasonable grounds to believe the statement made was true.  Id.

Here, there is sufficient evidence that Murray and Pimental spoke with actual malice when they made the statements that Plaintiff falsified time records.[12]  When the evidence is taken most favorably to Plaintiff, it appears Murray and Pimental made these statements because they wanted to see Plaintiff fired for engaging in the protected activity or they made the statements despite lacking reasonable grounds for believing they were true.   Murray testified that he did not know whether signing the time sheet constituted an affirmation by the manager that employees had not exceeded the break time allowed.  (Doc. 41-8 at 7-8)  Thus, it is unclear why he thought that Plaintiff's signature on the time sheet constituted a falsification.  Murray's statement is striking also in light of the fact that Murray knew that Medrano and Goold conducted business often while on their breaks.

For his part, Pimental fully admits that he did not believe that Plaintiff had falsified the time sheets after completing his investigation despite that he confirmed that the times listed by Medrano on the time sheets—which bear Plaintiff's signature—did not correspond to those times reflected on the video.  (Doc. 41-7 at 49)  Given this, there is no explanation for why he or any of the speakers could have believed that the statement that Plaintiff falsified time records was true.

Similarly, as noted above, Sommer fails to explain why he believed Plaintiff falsified the time

---

[12] Plaintiff's counsel clarified at the hearing that he does not rest his claim of defamation on statements made to the EDD.

records.  (Doc. 37-6 at 96)  Thornell also fails to explain why he believed that Plaintiff placing his signature on the time sheet meant that he "approved" them or the time entries placed on them by the employees.  Id. at 101.  Given all of this evidence, the Court concludes there is a question of fact which precludes summary judgment on the defamation claim.

**V.      Conclusion**

As set forth above, Plaintiff has demonstrated a prima facie case of retaliation.  Likewise, though Defendants have demonstrated legitimate business reasons for Goold's termination, Plaintiff has presented sufficient evidence that these reasons were a pretext for unlawful retaliation.  Moreover, because there is evidence statements related to Plaintiff falsifying time records were made with actual malice, there is a question of fact whether Defendants defamed Plaintiff.

**ORDER**

Based upon the foregoing, the Court **ORDERS**:

1.      Defendant's motion for summary judgment (Doc. 37, 43) is **DENIED**.

IT IS SO ORDERED.

Dated:   __**June 2, 2014**__              _____**/s/ Jennifer L. Thurston**_____
UNITED STATES MAGISTRATE JUDGE